THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

RICHARD SWEETEN and KAREN
SWEETEN,

Plaintiffs,

v.

MIDDLE TOWNSHIP, MIDDLE
TOWNSHIP POLICE DEPARTMENT,
and GREGG TAYLOR

Defendants.

HON. JEROME B. SIMANDLE

Civil No. 04-3512 (JBS)

**OPINION**

APPEARANCES:

Robert J. Campbell, Esq.
551 Route 50
Mays Landing, NJ 08330
    Attorney for Plaintiffs

James P. Savio, Esq.
LAW OFFICES OF JAMES P. SAVIO
Second Floor
1030 Atlantic Avenue
Atlantic City, NJ 08401
    Attorney for Defendants Middle Township and Middle Township
    Police Department

Robert P. Merenich, Esq.
GEMMEL, TODD & MERENICH, P.A.
767 Shore Road
P.O. Box 296
Linwood, NJ 08221
    Attorney for Defendant Gregg Taylor

**SIMANDLE**, District Judge:

In this action, Plaintiffs Richard and Karen Sweeten filed

suit against Middle Township, the Middle Township Police

Department (the "MTPD"), and former MTPD Detective Gregg Taylor,

alleging that they were injured as a result of the defendants'

violation of federal and state anti-wiretapping laws and commission of various torts under New Jersey law.  At the root of Plaintiffs' claims are a series of incidents that took place in 1996 that ultimately led to the removal of Plaintiff Richard Sweeten from his position as a police officer with the MTPD.  Mr. Sweeten lost his position with the MTPD as a result of his commission of certain acts of misconduct, which Mr. Sweeten alleges the defendants learned about only through the use of the unlawful interception of his telephone conversations.  The Sweetens seek damages for wiretap violations under 18 U.S.C. § 2520 and N.J.S.A. 2A:156A-24 (Counts One and Two), for intentional infliction of emotional distress (Count Three), for tortious interference with contract (Count Four), and for Mrs. Sweeten's loss of consortium (Count Five).

Presently before the Court are Plaintiffs' motion for partial summary judgment [Docket Item 45], Defendant Middle Township's motion for summary judgment [Docket Item 48], and Defendant Taylor's motion for summary judgment [Docket Item 63].  For the following reasons, the Court will grant the defendants' motions for summary judgment as to Counts Three, Four, and Five of the complaint, and will deny the remainder of the relief the parties seek.

**I.   BACKGROUND**

**A.   The January 11, 1996 Incident**

In January 1995, Mr. Sweeten was hired as a police officer with the MTPD. (Pl.'s Br. Ex. A 7.) On January 11, 1996, he was driving his police vehicle down Siegtown Road in Middle Township, New Jersey, when he observed four of his friends – Philip Zimmerman, David Allen Myers, Angela Durham, and Cheryl Berlanger – standing near the side of the road. (Id. at 16.) According to Mr. Sweeten, when his friends waved to him, he pulled over, stopped his vehicle, exited and walked in front of his vehicle in order to speak with his friends. (Id. at 68.) Mr. Sweeten left the vehicle's engine running and left its door open. (Id.)

After Mr. Sweeten approached his friends and began speaking with them, Mr. Myers, apparently in an effort to make a joke, snuck behind Mr. Sweeten, and, unbeknownst to Mr. Sweeten, entered the police vehicle. (Id. at 17-18; 68.) While Mr. Sweeten's back was turned to Mr. Myers and the police vehicle, Mr. Myers put the vehicle in gear and drove forward at a slow rate of speed, passing Mr. Sweeten. (Id. at 17-18.) According to Mr. Sweeten, he was startled by the fact that someone had entered his vehicle and did not realize that it was his friend who was driving the car; Mr. Sweeten was apparently concerned that whoever was driving the car would have access to the shotgun that was in the car. (Id.) Mr. Sweeten claims that he reacted "instinctively" by drawing his handgun from its holster and aiming it at the driver. (Id.) When he realized that it was Mr.

Myers behind the wheel and that Mr. Myers was simply playing a joke, Mr. Sweeten put his gun away, told Mr. Myers to get out of the car and said that "that was a dumb thing to do."  (Id. at 68.)  Mr. Sweeten and his friends proceeded to "jok[e] around" about the incident for several minutes before Mr. Sweeten left in his vehicle.[1]  (Def. Middle's Br. Ex. M 3.)

Later in the day on January 11, 2006, Mr. Sweeten spoke by telephone with Mr. Myers and Mr. Zimmerman about the events that led him to point his gun at Mr. Myers.[2]  (Def. Taylor Br. Ex. F 22-23.)  Although at the time Mr. Sweeten apparently "believed that [he] had a legitimate reason" for drawing his handgun, he nonetheless instructed both Mr. Myers and Mr. Zimmerman that if anyone ever asked either of them about the incident, they were to deny that Mr. Sweeten pointed his handgun at Mr. Myers.  (Id. at 22-24.)  Instead, Mr. Sweeten instructed Mr. Myers and Mr. Zimmerman to tell anyone who asked about the events of that day that Mr. Sweeten had drawn his police radio and aimed its antenna at Mr. Myers.  (Id.)  Mr. Sweeten testified during his deposition

---

[1]  Defendants have suggested that Mr. Sweeten drew his gun while engaging in "horseplay" with his friends, indicating that Mr. Sweeten never actually believed that someone other than Mr. Myers had entered his vehicle.  For the purposes of Defendants' motions for summary judgment, the Court accepts Mr. Sweeten's account of the events of January 11, 1996.

[2]  Mr. Sweeten apparently placed a single telephone call to the home at which both Mr. Myers and Mr. Zimmerman resided but spoke separately with each man.  (Def. Taylor Br. Ex. F 22-23.)

that he understood at the time both that he was "suggesting to these individuals that they provide false information to the authorities," and that it was unlawful for a police officer "to contact a potential witness to an event and attempt to influence that witness to provide false information to law enforcement officers as part of their investigation."  (Id. at 25-26.)

**B.   The Telephone Monitoring**

Unbeknownst to Mr. Sweeten, his telephone conversations with Mr. Myers and Mr. Zimmerman were being monitored.  A woman named Tamala M. Marks who lived on the same street as Mr. Sweeten had come into possession of an electronic device known as a "scanner" that could be used to intercept conversations made on cordless telephones.  (Def. Taylor Br. Ex. L 20.)  While Defendant Taylor denies having provided Ms. Marks with the scanner, Plaintiffs and Ms. Marks maintain that Mr. Taylor supplied Ms. Marks with the scanner and instructed her on how to use it.[3]  (Id. at 24.) According to Ms. Marks, Mr. Taylor, who at the time worked as a detective for the MTPD[4], had originally provided her with the scanner in order to listen to and record the telephone

_____

[3]  For purposes of Defendants' motions for summary judgment, the Court accepts as true Plaintiffs' account of these events. See Hunt v. Cromartie, 526 U.S. 541, 552 (1999).

[4]  In 2002, Mr. Taylor was suspended without pay from his position as a detective for conduct unbecoming a township official.  (Def. Middle's Br. Ex. V.)  Shortly thereafter, he "agreed to retire after admitting he misused confidential informants in investigations."  (Pl.'s Br. Ex. I-3.)

conversations taking place at the home of her neighbor, Lori
Abadie; Ms. Marks and Mr. Taylor had suspected that illegal drug
activity was taking place at the Abadie residence, and Ms. Marks
reportedly engaged in extensive telephone monitoring at Mr.
Taylor's behest.[5]  (Id. at 34-35.)

     At some point near the end of 1995, Mr. Taylor allegedly
urged Ms. Marks to use the scanner to monitor Mr. Sweeten's
telephone activities.  (Def. Taylor Br. Ex. L 83.)  In her
deposition testimony, Ms. Marks reported that Mr. Taylor referred
to Mr. Sweeten as "squirrel[l]y" and a "dirty cop" who might be
"dealing with drugs."  (Id. at 119.)  Mr. Taylor instructed Ms.
Marks to "see what [she] can get on" Mr. Sweeten, and Ms. Marks
listened extensively to Mr. Sweeten's telephone conversations
between the end of 1995 and early 1996.  (Id. at 127-29.)  On
January 11, 1996, Ms. Marks overheard and recorded Mr. Sweeten's
conversations with Mr. Myers and Mr. Zimmerman, including Mr.
Sweeten's instructions that his friends misrepresent Mr.
Sweeten's use of his handgun earlier that day.  (Pl.'s Opp. Br.
Ex. N-3 172.)  Ms. Marks played the tape of this recording to Mr.
Taylor, who subsequently informed Ms. Marks that Mr. Sweeten
would be investigated for his conduct.  (Def. Taylor Br. Ex. L

---

     [5]  In 1995, the police apparently raided the Abadie
residence and recovered drugs and drug paraphernalia, using Ms.
Marks' house as a meeting point prior to the raid.  (Def. Taylor
Br. Ex. L 34-37.)

179.)  Nothing in the record suggests that Mr. Taylor was acting
pursuant to a search warrant when he instructed Ms. Marks to
intercept Mr. Sweeten's telephone calls.

   **C.   The Investigation of Officer Sweeten**

   On January 12, 1996, then-Detective Taylor wrote an
"Investigation Report" detailing the contents of Mr. Sweeten's
conversations with Mr. Myers and Mr. Zimmerman.  (Def. Middle's
Br. Ex. K.)  The report (the "Taylor Report"), which identifies
Ms. Marks only as a "Good Citizen" or "GC-1," states that GC-1 is
a reliable informant who

> personally overheard a telephone conversation through a
> cordless telephone . . . [between Mr. Sweeten and
> "Dave" in which Mr. Sweeten] asked him not to say
> anything to anyone about what happened today, "Because
> he'll get fired.  Say that it was his radio antenna in
> his face."  Dave said he'll even up later!  Pety[6] said,
> "What did it feel like to have a 9mm Glock in your
> face," and they both laughed.  Pety said, "Don't say
> anything about messing with the shotgun."

(Id.)  The Taylor Report did not directly state that Ms. Marks
used the scanner to "overhear[]" Mr. Sweeten's conversation.

(Id.)  Following the issuance of Detective Taylor's report, the
MTPD commenced an internal affairs investigation into Mr.
Sweeten's conduct on January 11, 1996.  (Def. Middle's Br. Ex. L
68.)

   On February 29, 1996, MTPD detectives interviewed Mr. Myers,

---

   [6]  The Report notes that Mr. Sweeten "uses the nickname
'Pety.'"  (Def. Middle's Br. Ex. K.)

Mr. Zimmerman, and Mr. Sweeten.  Detective William Webster interviewed Mr. Myers, who at first informed Detective Webster that on January 11, he had snuck into Mr. Sweeten's vehicle in order to "play[] a joke," that when Sweeten saw Myers in his car, he "pulled out his MACE and pointed it at him," and that they all proceeded to "laugh[] about it."  (Def. Middle's Br. Ex. N.) When Detective Webster advised Mr. Myers that this account contradicted the information the police had received about the incident, Mr. Myers relayed a different account, stating that Mr. Sweeten had in fact drawn his firearm "as a joke" to indicate that Mr. Myers should get out of the car, and that Mr. Sweeten "just started laughing afterwards."  (Def. Middle's Br. Ex. M 7-8.)  Mr. Myers denied that Mr. Sweeten had urged him to lie about the events of January 11.  (Id. at 9.)

Detective Paul Loefflad interviewed Mr. Zimmerman on February 29, 1996.  (Def. Middle's Br. Ex. P.)  At first, Mr. Zimmerman told Detective Loefflad that during the January 11 incident Mr. Sweeten had drawn his portable radio and aimed it at Mr. Myers after Myers snuck into his automobile.  (Id. at 2.) When Detective Loefflad informed Mr. Zimmerman that this account contradicted information the police had received from both Myers and Sweeten, Mr. Zimmerman admitted that Sweeten had asked him to state that "he pulled his walkie talkie out, not his revolver" if anyone asked about the incident.  (Def. Middle's Br. Ex. O 10.)

8

Mr. Zimmerman admitted to Detective Loefflad that Sweeten had drawn his gun "and smiled like a joking[] smile" when he saw Myers in his vehicle.  (Id. at 8.)

Lieutenant Blake Moore interviewed Mr. Sweeten on February 29, 1996, after informing him that an internal affairs investigation had been launched into the events of January 11, 1996.  (Def. Taylor Br. Ex. R 2.)  In his first statement to Lieutenant Moore, which Lieutenant Moore recorded, Sweeten stated that when he saw Myers in his police vehicle, he pointed his radio, not his gun, at him and told him to exit the vehicle. (Def. Middle's Br. Ex. Q 7.)  Sweeten likewise denied having asked his friends to misrepresent the events of that day.  (Id.) However, after Sweeten had completed his first statement, Lieutenant Moore played a recording of the statement to Sweeten, and midway through the tape, Sweeten "suddenly said 'Stop it! Stop it!  I did it!  I did it!  I pulled my gun!  If I'm going to get fired, I might as well tell the [t]ruth!'"  (Def. Taylor Br. Ex. R 2) (some internal quotations omitted).  Sweeten subsequently admitted in a taped statement to Lieutenant Moore that he had drawn his firearm when Myers entered the vehicle, and that he told Myers and Zimmerman to say that Sweeten pointed a radio rather than a firearm if they were ever questioned about the incident.  (Def. Middle's Br. Ex. Q 7.)  On March 2, 1996, Sweeten was suspended without pay, and the matter was referred to

9

the Cape May County Prosecutor's office.  (Def. Middle's Br. Ex.
R.)

Shortly thereafter, Mr. Sweeten retained the services of
Joseph J. Rodgers, Esq., to represent him in the disciplinary and
criminal proceedings that resulted from the internal affairs
investigation.  (Def. Taylor Br. Ex. T.)  Over the course of his
representation of Mr. Sweeten, Mr. Rodgers met with MTPD Chief of
Police William H. Hevener and received discovery materials
related to the Sweeten investigation, including copies of the
statements Sweeten, Myers, and Zimmerman made to the police on
February 29, 1996.[7]  (Id. at 26, 29.)  According to his
deposition testimony, Mr. Rodgers never received a copy of the
Taylor Report when representing Mr. Sweeten.  (Id. at 48.)  Mr.
Rodgers testified that although he learned in his 1996 meeting
with Chief Hevener that the MTPD had become aware of Mr.
Sweeten's conduct because "somebody overheard a . . . telephone
conversation through a scanner[8] or something and called the
police," he assumed that someone "picked up" Sweeten's

_____

[7] Rodgers has testified in this matter as a result of
Sweeten's waiver of his attorney-client privilege.

[8] Mr. Rodgers also referenced the scanner in a letter he
wrote to a psychiatrist who was hired to examine and issue a
report on Sweeten.  (Def. Middle's Br. Ex. S.)  In the letter,
Mr. Rodgers states that he "learned from Chief Hevener that a
civilian was listening through a scanner to a portable phone
conversation in which Richard or one of his friend's discussed
the case."  (Id.)

conversations through a "wireless house phone."  (<u>Id.</u> at 34, 38.)
The notion that the interception of Sweeten's telephone calls was
the result of wiretapping activity was, according to Mr. Rodgers'
deposition testimony, "the last thing that crossed [his] mind."
(<u>Id.</u> at 39.)

Pursuant to N.J.S.A. 2C:43-12(e), Mr. Sweeten entered into a
Pre-Trial Intervention Program ("PTI Program") on September 5,
1996.  (Def. Middle's Br. Ex. A.)  Under the terms of the PTI
Program, the criminal charges that had been lodged against Mr.
Sweeten were held in abeyance for three years; he was required to
perform 200 hours of community service; he forfeited his position
as an MTPD policeman, his training certification, and his right
to future law enforcement employment; and he paid a fine.  (<u>Id.</u>)
After he completed the PTI Program, his criminal charges were
dismissed.

**D.   The Investigation of Detective Taylor**

In 2002, the Cape May County Prosecutor's Office initiated
an investigation into "allegations that Detective Gregg Taylor
gave one Tammy Marks a scanner and directed her to record
telephone conversations of people he suspected to dealing
narcotics."  (Pl.'s Br. Ex. G.)  As part of this investigation,
Ms. Marks gave a sworn statement (the "Marks Statement")
detailing her telephone interception activities on March 25,
2002, in which Ms. Marks stated that, amidst other telephone

monitoring activity, she intercepted and recorded Mr. Sweeten's calls at Mr. Taylor's request. (Pl.'s Br. Ex. H.)  While at least two articles were published in local newspapers in April and June of 2002 referring to the Taylor investigation, the articles did not indicate that Taylor was being investigated for wiretapping activities, and instead referred only to "conduct unbecoming a township official." (Def. Middle's Br. Ex. V.)  On November 1, 2002, Taylor "agreed to retire after admitting he misused confidential informants in investigations." (Pl.'s Br. Ex. I-3.)  During the last week of August in 2002, Mr. Sweeten allegedly first learned of the contents of the Marks Statement when a private investigator named Joseph Gianatasio provided him with a copy of the statement. (Pl.'s Opp'n Br. Ex. C ¶ 3.)

### E.   Procedural History

Mr. Sweeten filed a motion for leave to file a late notice of tort claim, pursuant to N.J.S.A. 59:8-9, with the Superior Court of New Jersey, Cape May County, on January 24, 2003, which the court granted on March 3, 2003. (Pl.'s Br. Ex. L.)  He subsequently filed a complaint in the instant litigation with this Court on July 22, 2004.  On February 11, 2005, Middle Township and the Middle Township Police Department (the "Middle Defendants") filed a motion to dismiss in which they argued that Plaintiffs' complaint was time-barred by the statutes of limitations applicable to the claims they alleged [Docket Item

12

11].  The Court dismissed this motion without prejudice on July

21, 2005 [Docket Item 24] in order to afford the parties the

opportunity to conduct discovery on the relevant statute of

limitations issues.  The parties have since conducted this

discovery and filed the motions for summary judgment that are

presently before the Court.[9]

## II.  DISCUSSION

Both the Middle Defendants and Defendant Taylor have moved

for summary judgment on each court of Plaintiffs' complaint.

Plaintiffs in turn have moved for partial summary judgment as to

the timeliness of their claims.  The Court addresses the parties'

motions with respect to each count of the plaintiffs' complaint

below.

### A.   Summary Judgment Standard

Summary judgment is appropriate when the materials of record

"show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(c).  A dispute is "genuine" if "the

evidence is such that a reasonable jury could return a verdict

for the non-moving party."  See Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 248 (1986).  A fact is "material" only if it might

affect the outcome of the suit under the applicable rule of law.

---

[9]  On July 18, 2007, the case was reassigned from the
Honorable Joseph H. Rodriguez, United States District Judge, to
the undersigned [Docket Item 73].

Id.

     In deciding whether there is a disputed issue of material
fact, the court must view the evidence in favor of the non-moving
party by extending any reasonable favorable inference to that
party; in other words, "the nonmoving party's evidence 'is to be
believed, and all justifiable inferences are to be drawn in [that
party's] favor.'"  Hunt v. Cromartie, 526 U.S. 541, 552 (1999)
(quoting Liberty Lobby, 477 U.S. at 255).  It there are "any
genuine factual issues that properly can be resolved only by a
finder of fact because they may reasonably be resolved in favor
of either party," then summary judgment may not be granted.
Liberty Lobby, 477 U.S. at 250; Brewer v. Quaker State Oil
Refining Corp., 72 F.3d 326, 329-30 (3d Cir. 1995) (citation
omitted).

     **B.   Counts One and Two – Federal and New Jersey Wiretap Act
           Claims**

     Count One of the plaintiffs' complaint alleges that "Mr.
Sweeten's conversations were recorded in violation of the Wire
and Electronic Communications Interception and Interception of
Oral Communications Act," 18 U.S.C. § 2510 et seq. (the "Federal
Wiretap Act"), which Plaintiffs claim entitles them to recover
under 18 U.S.C. § 2520(a).[10]  (Compl. ¶ 4.)  Count Two of the

---

     [10]   Under 18 U.S.C. § 2520(a), "any person whose wire, oral,
or electronic communication is intercepted, disclosed, or
intentionally used in violation of this chapter may in a civil
action recover from the person or entity, other than the United

complaint alleges that the defendants violated a parallel
provision of the New Jersey Wiretap and Electronic Surveillance
Control Act, N.J.S.A. 2A:156A-1 et seq. (the "New Jersey Wiretap
Act").  Civil actions seeking recovery under either statute must
be commenced no later than "two years after the date upon which
the claimant first has a reasonable opportunity to discover the
violation."  18 U.S.C. § 2520(e); see also Guichardo v.
Rubinfeld, 177 N.J. 45, (2003) (under New Jersey's "discovery
rule," two-year statute of limitations begins to accrue when
"injured party discovers, or by an exercise of reasonable
diligence and intelligence should have discovered, that he or she
may have a basis for an actionable claim").[11]  The parties'
arguments regarding the viability of the plaintiffs' wiretapping
claims focus chiefly on whether the claims were timely filed.

---

States, which engaged in that violation such relief as may be
appropriate."

   [11]  Claims brought pursuant to N.J.S.A. 2A:156A-24 are
subject to New Jersey's two-year general personal injury statute
of limitations.  See N.J.S.A. 2A:14-2; PBA Local No. 38 v.
Woodbridge Police Dept., 832 F. Supp. 808, 816 (D.N.J. 1993)
(applying N.J.S.A. 2A:14-2 to New Jersey Wiretap Act claim).
Under New Jersey's "discovery rule," the accrual of a cause of
action is delayed until the "plaintiff was aware, or reasonably
should have been aware[,] of the existence of a state of facts
that may equate in the law with a cause of action."  Yarchak v.
Trek Bicycle Corp., 208 F. Supp. 2d 470, 479 (D.N.J. 2002)
(quoting Vispisiano v. Ashland Chemical Co., 107 N.J. 416 (1987))
(emphasis omitted).  Thus, the statute of limitations inquiry
under the federal and state statutes is aimed at answering the
same question: under both statutes, a claimant's cause of action
begins to accrue when he or she has a reasonable opportunity to
discover that a violation occurred.

### 1.   Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs argue in their motion for partial summary judgment that the issue of whether their complaint was timely filed was litigated in an earlier proceeding when they filed their motion for leave to file a late notice of tort claim with the Superior Court of New Jersey, which was granted on March 3, 2003.  Accordingly, the plaintiffs argue, the defendants should be collaterally estopped from arguing the untimeliness of Plaintiffs' claims in this proceeding.

Defendants dispute Plaintiffs' argument that they are collaterally estopped from contesting this issue, reasoning that "the standards that are employed by the New Jersey State Superior Court with respect to determining whether a cause of action accrues under the New Jersey Tort Claims Act and the standards . . . [for accrual] under the Federal Wiretap Act . . . or the State New Jersey Wiretap and Electronic Surveillance Control Act . . . are markedly different."  (Def. Middle's Opp'n Br. 2.)  According to Defendants, the Superior Court decision merely addressed the narrow issue of whether Plaintiffs' claims were barred by the New Jersey Tort Claims Act (the "Tort Claims Act"), not whether the complaint was timely filed under 18 U.S.C. § 2520(e).  Moreover, Defendant Taylor argues that he had no notice or opportunity to respond to Plaintiffs' N.J.S.A. 59:8-9 motion, and that he therefore cannot be estopped from challenging the

timeliness of Plaintiffs' claims as a result of the Superior Court's decision.

The Court agrees with Defendants that they are not collaterally estopped from arguing the timeliness of Plaintiffs' claims.  Under New Jersey law, the question of whether collateral estoppel bars the relitigation of a specific issue requires that five factors be satisfied:

> (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.

Matter of Estate of Dawson, 136 N.J. 1, 20-21 (1994) (citations omitted).  Here, it is clear that the statute of limitations issues raised by Defendants were not "actually litigated" in the earlier proceeding, as is required under Dawson's second prong in order for a litigant to be collaterally estopped from relitigating an issue.

The "prior proceeding" that is the subject of Plaintiffs' preclusion arguments was brought in the Superior Court of New Jersey under N.J.S.A. 59:8-9.  Under the Tort Claims Act, a party suing a public entity or employee is "forever barred from recovering" if he "fail[s] to file his claim with the public entity within 90 days of accrual of his claim except as otherwise provided in section 59:8-9."  N.J.S.A. 59:8-8.  Section 59:8-9,

17

in turn, provides a means for a claimant to request court authorization to file "a late notice of claim."  N.J.S.A. 59:8-9. Plaintiffs filed their N.J.S.A. 59:8-9 motion with the Superior Court in on January 24, 2003, which the court granted on March 3, 2003.  (Pl.'s Br. Ex. H.)  The defendants did not oppose Plaintiffs' N.J.S.A. 59:8-9 motion and do not appear to have participated in the Superior Court action in any way.  (Id. at 5; Pls.' Br. 9.)

In light of the fact that the defendants did not participate in the Superior Court proceedings, the Court finds that the statute of limitations issues raised by Defendants' motions were not "actually litigated" in Superior Court.  Dawson, 136 N.J. at 20.  As a general matter, courts are unwilling to give preclusive effect to issues decided in prior proceedings if "the court [in the earlier proceeding] did not get the benefit of deciding the issue in an adversarial context."  In re Gottheiner, 703 F.2d 1136, 1140 (9th Cir. 1983) (citing, inter alia, Matter of McMillan, 579 F.2d 289, 293 (3d Cir. 1978)); see also LaFleur v. Teen Help, 342 F.3d 1145, 1150 (10th Cir. 2003); Restatement (First) of Judgments § 68 cmt. f (1942).  Defendant Taylor appears to have had no opportunity whatsoever to participate in the Superior Court proceedings, and the Middle Defendants apparently decided not to oppose Plaintiffs' motion for permission to file a late notice of claim under the Tort Claims

Act.  While the Middle Defendants' failure to oppose Plaintiffs'
motions before the Superior Court cannot now be used as a basis
to challenge the matter actually decided by the court's order –
namely, the permissibility of Plaintiffs' suit under the filing
requirements of the Tort Claims Act – the defendants are not
estopped from litigating before this Court defenses that were not
"actually litigated" in the Superior Court proceedings.  See 18
Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal
Practice and Procedure § 4419 (3d ed. 2001) ("a feeble effort to
litigate an issue actually decided may be found so inadequate as
to defeat preclusion for want of 'actual' litigation").
Accordingly, the Court will deny Plaintiffs' motion for partial
summary judgment.

### 2.   Defendants' Motions for Summary Judgment

Having determined that Defendants are not estopped from
litigating the timeliness of Plaintiffs' claims, the Court
proceeds to address the merits of the statute of limitations
defense to Plaintiffs' wiretapping claims.  The Court finds that
the existence of triable issues of fact as to "the date upon
which the claimant first ha[d] a reasonable opportunity to
discover the violation," 18 U.S.C. § 2520(e), preclude it from
granting Defendants' summary judgment motions as to Counts One
and Two of the complaint.

Section 2520(e) "bars a suit if the plaintiff had such

notice as would lead a reasonable person either to sue or to launch an investigation that would likely uncover the requisite facts." Sparshott v. Feld Entertainment, Inc., 311 F.3d 425, 429 (D.C. Cir. 2002).  This standard has been described as requiring "at least enough to put [the claimant] on inquiry notice that his rights might have been invaded." Davis v. Zirkelbach, 149 F.3d 614, 618 (7th Cir. 1998).  Where a defendant raises a section 2520(e) defense in the context of a summary judgment motion, it bears the burden of establishing that "no reasonable jury could [find that the plaintiff] did not have a reasonable opportunity to discover [the violation] more than two years before the start of the lawsuit." Sparshott, 311 F.3d at 429; see also Brown v. American Broadcasting Co., Inc., 704 F.2d 1296, 1304 (4th Cir. 1983) (holding that unless there is a "clear basis for the court to determine when plaintiff knew or should have known of the existence of her cause of action," the issue of whether the plaintiff had a reasonable opportunity to discover the violation "is a question to be resolved by a jury").

In this case, considering the evidence before the Court and drawing all reasonable inferences in Plaintiffs' favor, the Court finds that Defendants are not entitled to judgment as a matter of law on the statute of limitations defenses they assert. According to Mr. Sweeten's sworn testimony, he had no basis from which to infer that his telephone conversations with Mr. Myers

and Mr. Zimmerman were monitored and recorded until he received a
copy of the Marks Statement from Mr. Gianatasio in late August
2002.  (Def. Middle's Br. Ex. D; Pl.'s Opp'n Br. Ex. C ¶ 3.)
According to Mr. Sweeten, he was at no point informed that the
investigation of the events of January 11, 1996 was triggered by
information Ms. Marks received by monitoring his telephone
conversations.  (Def. Middle's Br. Ex. D 25-27.)  Mr. Sweeten's
testimony on this issue is corroborated by the testimony of his
attorney, Mr. Rodgers, which, although inconsistent, indicates
that neither he, nor his client, knew that Mr. Sweeten's calls
had been intentionally monitored, and that Mr. Rodgers assumed
that there was an innocuous explanation for the initiation of the
investigation into the events of January 11, 1996.  (Def. Taylor
Br. Ex. T 38.)  Based on this testimony and the absence of
evidence that anyone outside the MTPD or the Cape May County
Prosecutor's Office had any knowledge of Ms. Marks' telephone
monitoring activities, apart from Ms. Marks herself, until the
time when Sweeten learned that his calls had been taped, a jury
could reasonably conclude that Mr. Sweeten's first opportunity to
learn of the violation was August 2002.

The defendants present two arguments as to why Mr. Sweeten
should have suspected that a violation had taken place prior to
August 2002.  First, Defendants argue that because Mr. Sweeten
knew prior to August 2002 that the MTPD had launched an

investigation to assess whether Defendant Taylor had engaged in acts of misconduct, he should have been able to infer that a wiretapping violation occurred.  The Court disagrees.  Although Mr. Sweeten acknowledged having seen newspaper articles about Defendant Taylor's suspension before August 2002, there is nothing in the record to suggest that any press accounts of Taylor's suspension prior to August 2002 made any reference to wiretapping or other electronic monitoring activities.[12]  (Def. Middle's Br. Ex. D 8.)  Indeed, the two newspaper articles submitted by the defendants refer only vaguely to Taylor's misconduct, and do not even allude to telephone monitoring or the investigation of Mr. Sweeten.  (Def. Middle's Br. Ex. V.)  Such vague references to the Taylor investigation do not provide the sort of notice required for the Court to conclude, as a matter of law, that Plaintiffs should have known that Mr. Sweeten's calls were monitored prior to August 2002.  Cf. Zirkelbach, 149 F.3d at 618 (finding as a matter of law that plaintiff had notice of the

---

[12]  Defendants argue that the Court should infer that Plaintiffs knew that the Taylor investigation involved wiretapping activities, stating that "the Court should take judicial notice of the fact that when a longtime employee of a relatively small public entity loses his position or is suspended from his position because of a criminal investigation conducted by the County Prosecutor's office, rumors swirl among the employees of the small public entity like wildfire."  (Def. Middle's Br. 26.)  When ruling on a motion for summary judgment, the Court cannot make such inferential leaps at the expense of the non-moving party.  See Hunt v. Cromartie, 526 U.S. 541, 552 (1999).

wiretapping violation when "the other party to the conversation[]
told . . . [the claimant] that the police had a tape of them
talking").

Defendants next argue that there is sufficient evidence for
the Court to conclude that when representing Mr. Sweeten in 1996,
Mr. Rodgers was on notice that a wiretapping violation had
occurred.  Defendants draw the Court's attention to a letter that
Mr. Rodgers wrote in 1996 in which he stated that he "learned
from Chief Hevener that a civilian was listening through a
scanner to a portable phone conversation in which Richard or one
of his friends discussed the case."  (Def. Middle's Br. Ex. S.)
Because the attorney-client relationship is one of agent-
principal, Defendants argue, Mr. Rodgers' notice in 1996 should
be attributed to Mr. Sweeten.

Although Defendants' second argument as to why Plaintiffs
should reasonably have been on notice as to a potential
wiretapping violation before August 2002 presents a closer
question, the Court finds that summary judgment is unwarranted.
It is true that Mr. Rodgers' 1996 letter strongly suggests that
he was aware of facts that implied that illegal wiretapping
activity had occurred, notwithstanding his deposition testimony
to the contrary.  However, crediting Mr. Sweeten's deposition
testimony that he first learned of the monitoring in 2002 and
giving Plaintiffs the benefit of all reasonable inferences, a

23

jury could find that Mr. Rodgers did not share his suspicions with his client, who claims that he first became aware of the possibility of a violation in 2002.

Moreover, even if the Court were to accept that Mr. Rodgers knew or should have known of a wiretapping violation in 1996, the Court finds that imputation of Mr. Rodgers' suspicions to Mr. Sweeten is uncalled for because Mr. Sweeten's civil suit for wiretapping violations is sufficiently distinct from the criminal offenses that were the subject of Mr. Rodgers' representation that imputing Mr. Rodgers' alleged knowledge to Mr. Sweeten is inappropriate.  It is, of course, well-settled that "[t]he relationship between an attorney and the client he or she represents in a lawsuit is one of agent and principal." Veal v. Geraci, 23 F.3d 722, 725 (2d Cir. 1994).  Moreover, as a general matter, "[w]here an agent receives notice, that notice is imputed to the principal." In re Color Tile Inc., 475 F.3d 508, 513 (3d Cir. 2007).  Notwithstanding the sweeping language of these general propositions, however, the rule that an attorney's knowledge is imputed to clients is subject to important limitations.  See, e.g., Schwab v. Philip Morris USA, Inc., 449 F. Supp. 2d 992, 1072 (E.D.N.Y. 2006) (imputation of knowledge inappropriate in certain class action contexts); PBA Local No. 38 v. Woodbridge Police Dept., 832 F. Supp. 808, 816 (D.N.J. 1993) (same).  One such limitation is that the rule of imputation

applies only to "matters in which the lawyer represents the
client."  Restatement (Third) Governing Lawyers § 28(1) (2000);
cf. id. § 28 cmt. b ("[a] client is not charged with a lawyer's
knowledge concerning a transaction in which the lawyer does not
represent the client").

Mr. Rodgers' representation of Mr. Sweeten was limited to
the disciplinary and criminal proceedings arising out of the
allegations of firearm misuse and witness tampering that had been
lodged against Mr. Sweeten.  (Def. Taylor Br. Ex. T 21-22.)  The
instant lawsuit is entirely distinct from the matters that were
within the scope of Mr. Rodgers' representation.  Mr. Rodgers
represented Mr. Sweeten in a criminal matter, whereas this is a
civil suit.  The facts at the heart of the earlier matter
centered around Mr. Sweeten's misconduct in drawing his weapon
and urging his friends to lie to investigators, whereas the
critical facts in Mr. Sweeten's civil suit focus on the alleged
misconduct of the MTPD and its employees.  In other words, Mr.
Sweeten's wiretapping claims are factually and legally separate
from the matters that were within the scope of Mr. Rodgers'
representation, making the imputation of Mr. Rodgers' alleged
knowledge of the wiretaps inappropriate in this case.  See
Restatement (Third) Governing Lawyers § 28.

The Court finds that triable issues of fact exist as to when
Mr. Sweeten had a reasonable opportunity to discover that his

telephone conversations had been intercepted.  The defendants'
motions for summary judgment as to Counts One and Two of the
complaint will therefore be denied.

### C.    Count Three – Intentional Infliction of Emotional Distress

Defendants have moved for summary judgment as to Count Three
of the complaint, which alleges intentional infliction of
emotional distress.  (Compl. ¶¶ 11-15.)  Their argument is
twofold.  First, Defendants argue that Mr. Sweeten's claim for
intentional infliction of emotional distress is barred by New
Jersey's Tort Claims Act, which precludes the recovery of damages
against public entities and employees for pain and suffering
except in limited circumstances not applicable to Mr. Sweeten's
case.  Second, Defendants argue that, as a matter of law, Mr.
Sweeten has failed to present evidence sufficient to establish
the severity of mental anguish that is required to sustain his
claim under New Jersey law.[13]

The Court agrees with the defendants and will grant their

---

[13]   It is not entirely clear to the Court whether or not the
plaintiffs oppose the defendants' motion as to Count Three of the
complaint.  In their brief, Plaintiffs concede that the
intentional infliction of emotional distress claim "does not
appear to meet the threshold" requirements of the Tort Claims
Act.  (Pls.' Opp'n Br. 44.)  Nonetheless, they argue that the
Court should deny the defendants' motions in their entirety "and
allow Plaintiffs['] claims and causes of action to proceed before
the Court."  (Id. at 45.)  The point is moot in any case, as
Defendants are clearly entitled to summary judgment on Mr.
Sweeten's intentional infliction of emotional distress claim.

motions for summary judgment as to Count Three of the complaint. The Tort Claims Act limits the circumstances under which a plaintiff can recover damages for pain and suffering from public entities and employees.  Under N.J.S.A. 59:9-2(d),

> No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00.

A plaintiff seeking recovery for intentional infliction of emotional distress must meet the requirements of N.J.S.A. 59:9-2(d) in order to recover from public entities or employees. Lascurain v. City of Newark, 349 N.J. Super. 251, 281 (App. Div. 2002).  Although the New Jersey Supreme Court has held that "permanent psychological harm" can constitute the "permanent loss of a bodily function" under N.J.S.A. 59:9-2(d), Collins v. Union County Jail, 150 N.J. 407, 420 (1997), it has imposed strict requirements of proof on claimants seeking to "vault the pain and suffering threshold under the Tort Claims Act."  Gilhooley v. County of Union, 164 N.J. 533, 540 (2000).  Such claimants "must satisfy a two-pronged standard by proving (1) an objective permanent injury, and (2) a permanent loss of a bodily function that is substantial," id. at 540-41, and the medical treatment expenses must be shown to be in excess of $3,600.00, N.J.S.A. 59:9-2(d).

There is no evidence in the record to suggest that Mr.
Sweeten meets any of these requirements.  The only medical
evidence in the record regarding the impact of the defendants'
alleged conduct on Mr. Sweeten's mental health is a psychological
evaluation performed in 1996 indicating that Mr. Sweeten
experienced "a mild degree of emotional distress."  (Pls.' Opp'n
Br. Ex. W 4.)  Plaintiffs have offered nothing that would
establish that Mr. Sweeten suffered a permanent psychological
injury and the impairment of a substantial bodily function, or
that Mr. Sweeten's psychological harm has resulted in medical
treatment expenses in excess of $3,600.00.  The Court accordingly
finds that N.J.S.A. 59:9-2(d) precludes Mr. Sweeten from
recovering from Middle Township and the MTPD under his claim for
intentional infliction of emotional distress.[14]

Moreover, the Court finds that the evidence in the record is
insufficient as a matter of law to show that Mr. Sweeten suffered
the type of severe mental distress that is required in order to
survive a motion for summary judgment.  Under New Jersey law, in

---

[14]   There is insufficient evidence for the Court to determine
whether Defendant Taylor's "conduct was outside the scope of his
employment or constituted a crime, actual fraud, actual malice or
willful misconduct," which, if it were the case, would render the
terms of the Tort Claim Act inapplicable to him in his former
capacity as a public employee.  N.J.S.A. 59:3-14(a).
Nevertheless, because the Court finds, infra, that the record
contains insufficient evidence to establish the emotional anguish
Mr. Sweeten would need to prove in order to recover for
intentional infliction of emotional distress, his claim against
Defendant Taylor will likewise be dismissed.

order to recover for the intentional infliction of emotional
distress, a plaintiff must establish:

> (1) that the actor intended to inflict emotional
> distress or that he knew or should have known that
> emotional distress was the likely result of his
> conduct; (2) that the conduct was extreme and
> outrageous; (3) that the actions of the defendant were
> the cause of the plaintiff's distress; and (4) that the
> emotional distress sustained by the plaintiff was
> severe.

Young v. Hobart West Group, 385 N.J. Super. 448, 467-68 (N.J.

Super. A.D. 2005) (internal quotations and citations omitted).

As the New Jersey Supreme Court has noted, the final element of

the claim – the severity of the plaintiff's emotional distress –

"raises questions of both law and fact . . . [in that] the court

decides whether as a matter of law such emotional distress can be

found, and the jury decides whether it has in fact been proved."

Buckley v. Trenton Saving Fund Soc., 111 N.J. 355, 367 (1988).

The plaintiff must establish that the distress was "so severe

that no reasonable man could be expected to endure it."  Id. at

366 (citation omitted).  "Severe emotional distress means any

type of severe and disabling emotional or mental condition which

may be generally recognized and diagnosed by professionals

trained to do so, including posttraumatic stress disorder."

Taylor v. Metzger, 152 N.J. 490, 515 (1998) (citation omitted).

The New Jersey Supreme Court has described intentional infliction

of emotional distress as imposing upon plaintiffs "an elevated

threshold for liability and damages" in order for courts to

"authorize[] legitimate claims while eliminating those that should not be compensable." Buckley, 111 N.J. at 367.

The Court finds that Mr. Sweeten's evidence is insufficient as a matter of law to survive Defendants' motion for summary judgment as to his claim for intentional infliction of emotional distress. In describing the emotional impact of the events underlying this litigation, Mr. Sweeten said that he experienced stress, that he now has high blood pressure, that the change of careers made things "financially tight" for his family, that "it's always been there in my mind and on my heart," and that "it's always been a very heavy weight that I've always carried." (Def. Taylor Br. Ex. F 162-63.) As the Court noted, supra, the psychologist who evaluated Mr. Sweeten in 1996 concluded that Mr. Sweeten experienced only "a mild degree of emotional distress." (Pls.' Opp'n Br. Ex. W 4.)

This evidence is insufficient to present a triable question of fact as to whether Mr. Sweeten's distress was "so severe that no reasonable man could be expected to endure it." Buckley, 111 N.J. at 366 (citation omitted). The only medical evidence in the record indicates that Mr. Sweeten did not suffer from serious distress. Compare Fertile ex rel. Fertile v. St. Michael's Medical Center, 334 N.J. Super. 43, 55 (App. Div. 2000), rev'd on unrelated grounds, 169 N.J. 481 (2001) ("In this case, no expert testimony was offered addressing the emotional repercussions upon

30

[the plaintiff]"), with Taylor, 152 N.J. at 515 (doctor's diagnosis of post-traumatic stress disorder used to prove distress).  Defendants correctly argue that there is nothing to suggest that the distress Mr. Sweeten experienced was "disabling" in any way, Taylor, 152 N.J. at 515, and Plaintiffs have identified no evidence to the contrary.  In similar contexts, in which plaintiffs claimed to suffer from distress but failed to provide evidence that it was severe or disabling, New Jersey courts have rejected claims for intentional infliction of emotional distress as a matter of law.  See, e.g., Buckley, 111 N.J. at 368; Griffin v. Tops Appliance City, Inc., 337 N.J. Super. 15, 26 (App. Div. 2001).[15]  Because the facts in the record are insufficient for a jury to reasonably find that the distress Mr. Sweeten suffered was severe or disabling, the defendants are entitled to summary judgment as to Mr. Sweeten's claim for intentional infliction of emotional distress.

In short, Mr. Sweeten is precluded from recovering damages for pain and suffering under the Tort Claims Act, and his claim for intentional infliction of emotional distress is insufficient as a matter of law.  The Court will accordingly grant the defendants' motions as to Count Three of the complaint.

---

[15]  Because the Court concludes that there is insufficient evidence to find that Mr. Sweeten suffered from severe distress, it need not determine whether the other elements of the tort are satisfied here.

### D.    Count Four – Tortious Interference with Contract

Defendant Taylor moves for summary judgment on Count Four of the complaint, which alleges that he "committed negligent acts . . . which proximately caused plaintiff to los[e] his employment."[16]  (Compl. ¶ 17.)  Defendant Taylor argues that his conduct was not the proximate cause of Mr. Sweeten's injury, since "Taylor could not interfere unless Sweeten was, in fact, dirty as all he did was to hold a mirror up to Sweeten's criminal conduct."  (Def. Taylor's Br. 31.)  Defendant Taylor draws the Court's attention to the fact that "when Mr. Rodgers confronted his clients with the facts of this case in March of 1996, Sweeten did not deny that he had []drawn his weapon, pointed it in the general direction of a civilian driving his car, told his friends to lie about it and then himself lied about it."  (Id.)  Mr. Taylor's argument calls on the Court to conclude that between Mr. Sweeten's and Mr. Taylor's misconduct, the former was a proximate cause of Mr. Sweeten's injury but the latter was not.

Plaintiffs argue that Defendant Taylor is not entitled to summary judgment as to Mr. Sweeten's tortious interference claim because Taylor's argument requires "the Court to judge the matter

_____

[16]   The Middle Defendants likewise move for summary judgment on Count Four of the complaint "to the extent that there is an allegation against Middle Township in Count Four."  (Def. Middle's Br. 40.)  Because the Complaint clearly asserts the tortious interference with contract claim against Defendant Taylor alone, the Court need not address the Middle Defendants' arguments.

on whether it was wrong of Mr. Sweeten to pull his hand gun and point it at Mr. Myers on January 11, 1996," but under 18 U.S.C. § 2515, evidence of Mr. Sweeten's misconduct is the fruit of an illegal wiretap that the Court is prohibited from taking into account.  (Pls.' Opp'n Br. 40.)  Plaintiffs note that under section 2515 of the Federal Wiretap Act, "no part of the contents of [an intercepted] communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court . . . of the United States."  18 U.S.C. § 2515.  Plaintiffs argue in effect that all evidence of Mr. Sweeten's misconduct in 1996 is traceable to Taylor's alleged wiretapping violation, and so in considering Mr. Sweeten's tortious interference claim, "[n]o evidence may be used by this or any Court, which has been derived from the illegal interception, disclosure or use of the contents of Mr. Sweeten's telephone conversations."  (Pls.' Opp'n Br. 40.)

For the following reasons, the Court will grant Defendant Taylor's motion for summary judgment as to Count Four of the complaint.  Under New Jersey law, a plaintiff asserting a claim for tortious interference must establish four elements:

> (1) a protected interest, which need not amount to an enforceable contract; (2) intentional interference with that protected interest without justification; (3) the reasonable likelihood that the anticipated benefit from the protected interest would have been realized but for the interference; and (4) economic damage as a result.

C&J Colonial Realty, Inc. v. Poughkeepsie Sav. Bank, FSB, 355

33

N.J. Super. 444, 478 (App. Div. 2002) (citation omitted).  Under
the third prong, the plaintiff must prove that the interference
was "malicious."  Ideal Dairy Farms, Inc. v. Farmland Dairy
Farms, Inc., 282 N.J. Super. 140, 199 (App. Div. 1995).
Significantly for the instant litigation, "malice" in this
context refers not to "ill-will toward the plaintiff," but
instead requires the plaintiff to prove that "the harm was
inflicted intentionally and without justification or excuse."
Id. (quoting Printing Mart-Morristown v. Sharp Electronics Corp.,
116 N.J. 739, 751 (1989)).  An act of interference is without
justification or excuse if it is "injurious and transgressive of
generally accepted standards of common morality or of law."
Lamorte Burns & Co., Inc. v. Walters, 167 N.J. 285, 306 (2001)
(citation omitted).

     The Court finds that as a matter of law, the pleadings and
evidence before it are insufficient to satisfy the third element
of a tortious interference claim – namely, unjustified
interference with Mr. Sweeten's employment contract.  Mr. Sweeten
has alleged facts and submitted evidence that, if proven, would
indeed appear to be "injurious and transgressive of generally
accepted standards of common morality or of law."  Id.  However,
these allegedly injurious acts preceded the interference with his
employment contract that Mr. Sweeten claims.  In zeroing in on
the alleged interference at the heart of Mr. Sweeten's claim –

the point at which Mr. Taylor is alleged to have interposed himself between Mr. Sweeten and the MTPD – the Court finds that the evidence indicates only that Mr. Taylor transmitted information regarding Mr. Sweeten's misconduct to the MTPD. This specific act of "interference" was not "a wrong without excuse or justification." Dello Russo v. Nagel, 358 N.J. Super. 254, 268 (App. Div. 2003) (citation omitted). Plaintiffs have not alleged that Mr. Taylor fabricated the misconduct Mr. Sweeten is alleged to have committed, nor would the evidence in the record support such a claim. Defendant Taylor may have been unjustified in the means by which he acquired the incriminating information about Mr. Sweeten, as Plaintiffs have alleged in Counts One and Two of their complaint, and if he acquired this information unlawfully, then he may be held civilly liable to Mr. Sweeten under federal and state anti-wiretapping acts. However, this allegedly wrongful conduct preceded, and is distinct from, the allegedly tortious interference between Mr. Sweeten and his employer.

Nor is Plaintiffs' evidence that Mr. Taylor transmitted information about Mr. Sweeten's misconduct out of alleged ill-will toward Mr. Sweeten sufficient to create a jury question on Mr. Sweeten's tortious interference claim. Plaintiffs' evidence does suggest that Mr. Taylor's act of informing the MTPD of Mr. Sweeten's misconduct was motivated by personal enmity toward Mr. Sweeten, in that, according to Ms. Marks, Mr. Taylor referred to

35

Mr. Sweeten as "squirrel[l]y" and a "dirty cop" who might be
"dealing with drugs." (Def. Taylor Br. Ex. L 119.) However, Mr.
Taylor's personal ill-will does not in itself satisfy the
malicious interference requirement of the tort, which, again,
requires a showing of an unjustified injury, not simply "rank
animosity." Ideal Dairy Farms, Inc., 282 N.J. Super. at 199.

Mr. Sweeten's argument that the Court cannot consider Mr.
Sweeten's own misconduct in 1996 in its analysis of Mr. Taylor's
motion because "[n]o evidence may be used by this or any Court,
which has been derived from the illegal interception, disclosure
or use of the contents of Mr. Sweeten's telephone conversations"
must be rejected. (Pls.' Opp'n Br. 40.) Irrespective of the
extent to which 18 U.S.C. § 2515 impacts the admissibility of
evidence derived from the interception of Mr. Sweeten's 1996
telephone call, Mr. Sweeten's deposition testimony in this
litigation acknowledges the misconduct in question. Mr. Sweeten
testified that he instructed his friends to misrepresent the
events of January 11, 1996 to the authorities, and he
acknowledged that he was "suggesting to these individuals that
they provide false information to the authorities," and that it
was illegal for a police officer "to contact a potential witness
to an event and attempt to influence that witness to provide
false information to law enforcement officers as part of their
investigation." (Def. Taylor Br. Ex. F 25-26.) Mr. Sweeten's

testimony in this case is not derived from an unlawfully intercepted communication and is not inadmissible under 18 U.S.C. § 2515.

The Court will accordingly grant Defendant Taylor's motion for summary judgment as to Count Four of the complaint.

### E.   Count Five – Per Quod Consortium

Count Five of the complaint alleges that Mr. Sweeten's wife is entitled to per quod damages based on the "expenses and hardship" that resulted from Mr. Sweeten's "loss of employment and mental anguish."  (Compl. ¶ 21.)  The Court agrees with the defendants that they are entitled to judgment as a matter of law as to Count Five.  Under New Jersey law, "[l]oss of consortium claims may be brought by a spouse for injury to his or her spouse arising from a tort.  The right of the spouse to recover on a loss of consortium claim depends upon the existence of tortious conduct on the part of the defendants."  Horvath v. Rimtec Corp., 102 F. Supp. 2d 219, 236 (D.N.J. 2000) (internal quotations and citations omitted).  A spouse's claim for per quod recovery cannot be "founded solely on a spouse's economic loss." Cappiello v. Ragen Precision Industries, Inc., 192 N.J. Super. 523, 532 (App. Div. 1984); see also Horvath, 102 F. Supp. 2d at 236; Reilly v. Prudential Property and Cas. Ins. Co., 653 F. Supp. 725, 735 (D.N.J. 1987).

In this case, the Court has granted Defendants' motions for

summary judgment as to Mr. Sweeten's claim for intentional infliction of emotional distress and tortious interference. Because there are no injuries "arising from a tort" remaining in this case, Mrs. Sweeten's claim for loss of consortium must be dismissed.  <u>Horvath v. Rimtec Corp.</u>, 102 F. Supp. 2d at 236.  The Court will thus grant Defendants' motions for summary judgment as to Count Five of the complaint.

**III. CONCLUSION**

For the reasons discussed above, the Court will grant Defendants' motions for summary judgment as to Counts Three, Four, and Five of the complaint, but will deny the remainder of the relief sought in the parties' motions.  The accompanying Order will be entered.

**<u>December 14, 2007</u>**               **<u>s/ Jerome B. Simandle</u>**
Date                              JEROME B. SIMANDLE
                                  United States District Judge

38